MURPHY LOGGING CO., successor by merger to Murphy Timber Co., Harry C. Murphy and Dorothy Shea Murphy, Edward J. Murphy and Virginia C. Murphy, Peter C. Murphy and Dorothy Z. Murphy, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. No. 63–546.

United States District Court
D. Oregon.
March 24, 1965.

Davidson, Duffy & Stout, Portland, Or., for plaintiffs.

Gary P. Smith, Washington, D. C., Sidney I. Lezak, U. S. Atty., Portland, Or., and Louis F. Oberdorfer, Asst. Atty. Gen., and Jerome Fink, Washington, D. C., for defendant.

SOLOMON, Chief Judge.

For some years prior to February 2, 1959, three Murphy brothers—Harry, Edward and Peter—operated the Murphy Logging Company as partners. Each received a salary of $25,000 a year, and profits when made were distributed in the same proportion as their interests, namely, Harry 53⅓%, Edward 33⅓%, and Peter 13⅓%.

On February 2, 1959, the Murphy brothers organized the Murphy Timber Co., an Oregon corporation. This corporation was capitalized at $1,500, and each of the Murphy brothers agreed to purchase $500 in stock.

On March 1, 1959, the Murphy partnership agreed to sell, and it delivered some of its logging equipment, which was carried on the books at $28,414.10, to the new corporation at a price to be determined at a later date by an independent appraiser. On the same day, the Murphy corporation entered into two standard form written contracts to log and to construct roads for the Crown-Zellerbach Corporation. Shortly thereafter, it undertook to perform such contracts.

On April 6, 1959, each of the Murphy brothers paid the corporation $500 for his stock. One week later, the corporation borrowed $25,000 from The First National Bank of Oregon to carry on its operations, and between May 4 and July 30 the corporation borrowed additional sums totalling $50,000 for the same purpose from the bank.

In September, an independent appraiser fixed the value of the equipment transferred to the corporation at $238,150. On December 31, 1959, the corporation borrowed a total of $240,000 from the bank, and on the same day the corpora-

tion paid $238,150 to the partnership. All of the bank loans were guaranteed by the brothers individually.

In the partnership tax return for the calendar year 1959, the partners reported a long-term capital gain of $209,735 on the sale of this equipment, and each of the partners filed a return and paid a tax on his distributive share of the gain.

The District Director reduced the corporation's claimed depreciation by treating the transfer of this equipment as a non-taxable exchange under the provisions of Internal Revenue Code of 1954, § 351(a). He disallowed claimed interest deductions by treating the bank borrowings by the corporation as though the shareholders had borrowed the funds individually. The Commissioner of Internal Revenue sent notices of income tax deficiencies not only to Murphy Logging Co., the plaintiff corporation, successor to Murphy Timber Co. (corporation), but also to the Murphy brothers individually. The taxes were paid, and thereafter the plaintiffs filed claims for refunds. Upon disallowance of these claims, plaintiffs filed this action.[1]

Plaintiffs assert that the agreement between the partnership and the corporation was a bona fide sale and not a tax free exchange. They also assert that the bank loan used to pay for this equipment was not the partners' obligation, but the obligation of the corporation. If that were true, the Murphy brothers would be entitled to long-term capital gains treatment on almost $210,000 of partnership profits made on the $238,150 sale to the corporation, and the corporation would be entitled to this stepped-up value as its basis for depreciation. The corporation could deduct as an expense the interest paid on the bank loan and principal payments on the bank loan, being obligations of the corporation, would not constitute taxable dividends to the brothers individually.

■■ Thin capitalization alone will not invalidate an otherwise valid business arrangement, nor is an arm's length transaction required to make it valid. See Rowan v. United States, 5 Cir. 1955, 219 F.2d 51, 55; Sun Properties, Inc. v. United States, 5 Cir. 1955, 220 F.2d 171, 174. But thin capitalization and lack of an arm's length transaction do raise questions of whether the substance is the same as the form. Where documents which purport to evidence the sale are merely a sham or a masquerade for an arrangement which has no purpose germane to the conduct of the business other than tax avoidance, the Court must treat the transactions in their true light. Miller's Estate v. Commissioner, 9 Cir. 1956, 239 F.2d 729, 734.

Plaintiffs recognize that the corporation was thinly capitalized, but they assert that "the primary reason the contribution of the shareholders was so low was because [Peter Murphy] did not have sufficient cash on hand to contribute any more." Peter Murphy's income tax return shows that in March, 1959, he made a long-term capital gain of $45,041.49 on the sale of a block of stock, and in the year 1959 he received substantial dividend and interest income, two-thirds of which was exempt from federal income taxes. Likewise, his other income, his charitable contributions, and the negligible amount of interest that he paid in 1959 all indicate an ability to make a substantial investment in a new business venture.

Plaintiffs assert "that the adequacy of capitalization depends upon the nature of the business." This is correct, but there should be a reasonable relationship between the capital of a corporation and the assets needed to carry on its operations. Here the authorized and paid-in capital was $1,500. Before it was paid, the corporation bought equipment subsequently appraised for $238,150, and within four months borrowed sums totalling $75,000 to carry on its operations.

1. The wives of the Murphy brothers are named as plaintiffs only because joint tax returns were filed for the years in question.

Plaintiffs also assert that "[i]n the contract logging business not much initial capitalization is needed, especially where a favorable logging contract exists from the outset from which quick realization of funds is to be expected." The admitted facts demonstrate that the contrary is true. But plaintiffs argue that the contracts with Crown-Zellerbach "had obvious value", and when considered with the paid-in capital, support a finding that the corporation was adequately financed.

There was no evidence as to the value of the two Crown-Zellerbach contracts or that these contracts had ever been appraised. Likewise, there was no evidence that the Murphy brothers, either before or after the corporation was organized, received any advantage from Crown-Zellerbach either in rates or terms over any of their competitors in this highly competitive field. There are too many bankruptcy reviews, Miller Act and breach of contract cases, and actions on bonds involving logging and road construction jobs which come into this Court, primarily because of inadequate capitalization, to place any reliance in counsel's argument that $1,500 plus two Crown-Zellerbach contracts furnished adequate capitalization for a new corporation undertaking two large logging and road construction jobs. Logging and road construction contracts are hazardous even for the most expert operators. The amount of rain that one encounters, or the amount of rock that one finds, both of which are often unforeseeable, will determine whether a contract is a bonanza or a disaster.

The manner in which a corporation is operated is also significant in determining the bona fides of a transaction. Here the equipment was not appraised for at least six months after it was transferred to the corporation, and payment was not made for more than three months after its appraisal. Neither rent nor interest was paid; likewise, no instrument evidencing the indebtedness was executed. Payment was delayed until the last day of the taxable year because,

as one of the Murphy brothers testified, the brothers did not want to pay the bank any more interest than they had to.

The Murphy brothers, according to the 1959 partnership and individual income tax returns, had ample assets to justify $315,000 in bank loans which they as individuals guaranteed. However, plaintiffs contend that the $240,000 loan was made to the corporation and not to them individually. They called a bank officer who testified that the bank would have made the loan even without their guaranties. The bank allegedly loaned to a corporation with a capital of only $1,500 sums totalling $75,000 for operating expenses and later $240,000, which was paid out immediately to purchase used equipment. In other words, both before and after the loan, the ratio of the corporation's assets to liabilities was one to one. This is just another instance in which a bank officer stretched the truth for a good customer on facts that did not and probably would never occur. Luckily, the bank officer did not have to defend the loan before a bank examiner, and obviously he did not expect anyone to believe his testimony.

Even though the interests of the brothers in the corporation were different than their interests in the partnership, this was incidental to the real purpose for which they organized the corporation. The various transactions were a masquerade to enable the brothers to step up the value of greatly depreciated equipment by approximately $210,000, withdraw it from the business, and pay taxes thereon at the reduced long-term capital gains rates, and at the same time continue to operate the business with the same equipment and with the same degree of control as they did when the equipment was in the partnership.

The real substance of these transactions consisted of a capital contribution of equipment by the brothers to the corporation and a loan by the bank to the brothers as individuals.

There is no merit in plaintiffs' alternative contention that the $240,000 is to

be treated as "boot" under the provisions of Section 351(b) of the Internal Revenue Code of 1954.

This opinion and the admitted facts in the pre-trial order shall serve as my findings and conclusions. Either party may request additional findings.